## Dommes *v.* Zuroski, Appellant.

Argued May 23, 1944. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and HUGHES, JJ.

*John Memolo,* with him *David Schwartz,* for appellant.

*Frank J. McDonnell,* for appellee.

OPINION BY MR. JUSTICE LINN, June 30, 1944:

Plaintiffs, a father and his minor son, have judgments on verdicts in their suit to recover for injuries sustained by the minor who was shot by the defendant. The father has judgment for $395,[1] the minor for $4,000. This was the third trial. After the first trial, with verdicts for plaintiffs, a new trial was granted. In the second trial, the jury disagreed.

Defendant took only one appeal, which, we assume[2] from the brief, was from the judgment for the minor.

The assignments of error, as summarized in the statement of questions involved, complain that the plaintiff did not prove the shooting averred, and that the verdict was excessive.

Considering the evidence most favorably supporting the verdict, the jury may have found the following facts. Defendant owned land on what is described as the East Mountainside in Scranton; on his land was a pond of some length and about 50 feet wide. About dusk, May 25, 1939, boys were fishing in the pond when the minor plaintiff arrived to warn his brother, who was among them, to come away. He was a trespasser. The defendant got his gun containing a shell or shells loaded with bird shot and, without warning, and with the intention of inflict-

---

[1] The total of "doctors' bills, pharmacy bills, hospital and x-ray bills" proved was $394.25.

[2] Unless we make this assumption, we must quash the appeal as taken from two judgments.

ing bodily harm, fired at the boys who were then only about 75 feet from him. Approximately 100 pellets of bird shot entered plaintiff's body, principally about his chest, face and head. One eye was injured so seriously that, as one physician testified, ". . . vision was reduced to about 10-200, which was below useful vision." [3] Plaintiff was taken to a hospital and confined there about a week for treatment; many of the pellets, but not all, were removed. He was then 16 years of age. His face is disfigured by pellet marks and he still suffered at the time of the trial from the effect of the shooting.

On the next morning, while under arrest, defendant made a statement to Captain Scull and other officers of the Scranton Police Department, which, after being transcribed, he signed. He stated that he thought the boys intended to steal his pigeons, and that, "When I picked up the gun I didn't move a foot, I stood by the firewood, held the gun up and fired. Q. Did you mean to shoot them? A. No, I wanted to scare them."

It is unnecessary separately to consider the assignments of error to portions of the charge or to the refusal of points. The jury was fairly and adequately instructed.

Defendant called no witnesses and did not take the stand. In the course of his charge Judge MAYS referred to this fact and said to the jury: "But the fact remains that he was in court; and could he have thrown any more light upon this subject? Well, he didn't go upon the stand. Now, you may not make any presumption against him because of that; but it is a fact, a circumstance, that

---

[3] "Q. By that 'below useful vision' what do you mean, Doctor, as far as your conclusion to the jury, I mean, is concerned? A. Well, I would say he had—if he had to depend entirely on that one eye, he would be in a pretty bad state as far as making a living today which one could get along in. Q. And as to the way that you found the eye in 1941, would you say that he had any vision or just a little vision? A. Oh, he had some vision. He could look out of the corner of this scar a little, from one side; but he hadn't any central vision; when he looked straight ahead he had no central vision."

you may take into consideration in deciding what is the truth in this controversy. Is it the truth as he said in this statement: Yes, I pulled the trigger, I fired off this gun, but I had it directed up into the air and toward the heavens. Or is it the truth as contended for by the plaintiffs, that the gun was pointed toward these boys, any one of them?" The assignment complaining of that instruction is overruled; the jury would be justified in inferring from the absence of his testimony that, if honestly given, it would be unfavorable to himself, or in other words, that the plaintiff and his witnesses truthfully described the shooting.[4]

With respect to damages, the learned judge charged, inter alia, that if the jury found for the plaintiff they might "allow . . . for that pain and suffering and for that permanent injury such a sum as will fairly, as will reasonably, as will justly and equitably compensate the plaintiff for the pain and suffering that he has undergone and that he may undergo, and for the permanent injury that is his." The complaint against that instruction is overruled: compare *Bockelcamp v. Lack. & W. V. R. Co.*, 232 Pa. 66, 81 A. 93; *Rooney v. Maczko*, 315 Pa. 113, 120, 172 A. 151.

In considering the amount of the verdict the learned trial judge, in his opinion refusing a fourth trial, referred to *Renz v. Hazlett*, 330 Pa. 306, 198 A. 675, and *Hitz v. Pittsburgh & Butler St. Ry.*, 245 Pa. 7, 91 A. 215. He said, "In view of the testimony, we cannot now say that it is excessive. It must be remembered too that this was an action for an alleged assault. Defendant's act amounted to wanton recklessness and wilful cruelty." No reason has been suggested why we should substitute our judgment for his.

The judgment is affirmed.

---

[4] *Brown v. Schock*, 77 Pa. 471, 478; *Lewis v. Fleer*, 30 Pa. Superior Ct. 237; *Hall v. Vanderpool*, 156 Pa. 152, 155, 26 A. 1069; *Albert v. P. R. T. Co.*, 252 Pa. 527, 532, 97 A. 680; *Steel v. Snyder*, 295 Pa. 120, 127, 144 A. 912; *Nikitka's Estate*, 346 Pa. 63, 65, 29 A.2d 521; 2 Wigmore (3rd ed. 1940) section 289, p. 171.