538 A.2d 903

**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**James Jay TATE.**

Superior Court of Pennsylvania.

Submitted Jan. 25, 1988.

Filed March 1, 1988.

612

Vincent C. Mujrovich, Jr., Pittsburgh, for Com., appellant.

Dara A. DeCourcy, Assistant District Attorney, Pittsburgh, for appellee.

Before TAMILIA, WATKINS and HESTER, JJ.

TAMILIA, Judge:

This is a timely appeal by the Commonwealth of Pennsylvania from an Order of the Court of Common Pleas of Allegheny County, dated July 22, 1987, which denied the Commonwealth's petition for forfeiture of $1,950 cash belonging to appellee James J. Tate.

Tate was arrested on November 15, 1985, and charged with violations of the Controlled Substance, Drug, Device and Cosmetic Act, 35 P.S. § 780–101 *et seq.*, including the delivery of a controlled substance (cocaine), 35 P.S. § 780–113(a)(30), possession with intent to deliver a controlled substance (cocaine), 35 P.S. § 780–113(a)(30), and possession of a controlled substance (cocaine), 35 P.S. § 780–113(a)(16).

However, these charges were nolle prossed on May 9, 1986.[1] In connection with the charges, the Commonwealth filed a petition to condemn and forfeit one 1978 Toyota Celica and $1,950 cash. After hearing, the trial judge signed an Order granting the petition as to the 1978 Toyota Celica, but reserved judgment concerning the $1,950 in cash. Subsequently, on July 22, 1987, the trial judge denied the forfeiture of the $1,950 and ordered the money be returned to Tate. This timely appeal followed on August 21, 1987.

At the hearing on the Commonwealth's petition, the parties stipulated to the facts concerning the arrest and seizure in question (N.T. 8/14/86, p. 2). On November 8, 1985, Tate borrowed $3,000 from the Central Bank in Cleveland, Ohio, which was a cash advance disbursement draft charged against his Visa credit card. On that date, he then purchased a one-way airline ticket from Cleveland to Miami, Florida, where he met with drug dealers to obtain one kilo of cocaine for the purchase price of $35,500 (N.T. at p. 7). Tate raised the purchase price by using $20,000 of his own previous profits from a prior drug transaction and money obtained from a partner. The record does not disclose the exact amount of money his partner contributed to the Miami drug purchase, but does indicate they were equal partners. After buying the cocaine in Florida, Tate used a rented motor vehicle to transport the cocaine back to Cleveland and split the kilo. Tate then deposited three-quarters of a pound of cocaine in a bank safety deposit box and took another quarter pound in his 1978 Toyota Celica to Pittsburgh, Pennsylvania, to sell portions to Doug Blodgett, an undercover police officer, and three other men. On November 15, 1985, Tate met with Officer Blodgett and in exchange for a quantity of cocaine, he received $7,500 from the officer. After this sale he was placed under arrest.

At the time of his arrest Tate consented to a search of the trunk of his car and his brief case contained in the trunk. Inside the brief case the police found: a quarter pound of

1. This was as a result of appellant pleading guilty to federal charges of delivery of cocaine.

cocaine; the $1,950 cash which is the subject of this action and which was contained in a white envelope marked "Central Bank"; title to the Toyota; and receipts for Tate's rental vehicle which he drove from Miami, his gasoline on that trip, and motel lodging from that trip. We agree with defense counsel (N.T. at p. 12) and the trial court that "in view of the [appellee] meeting a person to whom he was going to sell a large quantity of cocaine he stored all other personal property of value in the brief case which he locked in the trunk" (Slip Op., McFalls, J., 10/20/87, p. 3).

Based on statements Tate made to the police and the stipulation of facts presented, the trial court concluded Tate had not made any drug transactions from the time he arrived in Cleveland on November 10, 1985 until he met Officer Blodgett on November 15, 1985; therefore, Tate had received no income from drug related activities prior to his meeting with Officer Blodgett and subsequent arrest. The fact that Tate had borrowed $3,000 from the Central Bank in Cleveland and that the $1,950 in question was found in an envelope marked "Central Bank" gives rise to a reasonable inference that the money contained in the envelope was the balance left from the $3,000 cash advancement.

The Commonwealth argues that under the stipulated facts it proved by a preponderance of the evidence that the cash found in the brief case was "used or intended to be used to facilitate any violation" of the Controlled Substance, Drug, Device and Cosmetic Act, *supra,* and was, therefore, subject to forfeiture under 35 P.S. § 780–128(a)(6)(i)(C). In support of its argument, the Commonwealth claims the rebuttable presumption set forth in 35 P.S. § 780–128(a)(6)(ii), that money found in close proximity to a controlled substance possessed in violation of the Act is presumed to be proceeds derived from the selling of such a controlled substance and, therefore, subject to forfeiture, applies to the $1,950.

■ Forfeiture proceedings under section 780–128 of the Act are civil in form, but quasi-criminal in character, and do not require the full panoply of rights due a criminal defend-

ant in criminal proceedings. *Commonwealth v. 1978 Toyota*, 321 Pa.Super. 549, 468 A.2d 1125 (1983); *Commonwealth v. Landy*, 240 Pa.Super. 458, 362 A.2d 999 (1976). For this reason, in a forfeiture proceeding the Commonwealth is required to prove the material allegations by a preponderance of the evidence only. *Estate of Peetros v. County Detectives*, 341 Pa.Super. 558, 492 A.2d 6 (1985); *1978 Toyota, supra; Landy, supra.*

In 1984, section 780–128(a) of the Controlled Substance, Drug, Device and Cosmetic Act was amended to add the following subsection:

§ 780–128 Forfeiture

(a) The following shall be subject to forfeiture to the Commonwealth and no property shall exist in them:

. . . .

(6)(i) Consideration as follows:

(A) Money, negotiable instruments, securities or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance in violation of this act.

(B) Proceeds traceable to such an exchange.

(C) *Money,* negotiable instruments and securities *used or intended to be used to facilitate any violation of this act.*

(D) Real property, including things growing on, affixed to and found in the land.

(ii) No property shall be forfeited under this clause, to the extent of the interest of an owner, by reason of any act or omission established by the owner to have been committed or omitted without the knowledge or consent of that owner. *Such money and negotiable instruments found in close proximity to controlled substances possessed in violation of this act shall be rebuttably presumed to be proceeds derived from the selling of a controlled substance in violation of this act.*

35 P.S. § 780–128(a)(6) (emphasis added).[2]

In *Commonwealth v. $15,856.85–Cash,* 354 Pa.Super. 279, 281–83, 511 A.2d 871, 873 (1986), we held that section 780–128(a)(6) is not to be applied retroactively to seizures which occurred prior to the effective date of the amendment and stated that:

The 1984 amendment of the Drug Act altered the common law in one important aspect: it created a rebuttable presumption that money found in close proximity to illegal drugs is money derived from illegal drug sales. With or without the presumption, however, the Commonwealth must prove by a preponderance of the evidence that the money was derived from illegal drug transactions.

(Citations omitted.) As in *$15,836.85–Cash,* we must determine whether the record supports the trial court's finding under this standard. This is the first appellate case to deal with the 1984 amendment on the merits of the case in which the presumption is a consideration.

Although the rebuttable presumption set forth in section 780–128(a)(6)(ii) certainly applies to the $1,950 in dispute, we find that under the factual circumstances of this case the presumption has been adequately rebutted, lending no support to the Commonwealth's burden of proof. Our Supreme Court has adhered to the view that "virtually all so-called 'criminal presumptions' are really no more than permissible inferences." *Commonwealth v. Mason,* 483 Pa. 409, 413, 397 A.2d 408, 411 (1979); *Commonwealth v. DiFrancesco,* 458 Pa. 188, 193, 329 A.2d 204, 208 (1974). As the Court explained in *Commonwealth v. Shaffer,* 447 Pa. 91, 104–06, 288 A.2d 727, 735 (1972), *cert. den.,* 409 U.S. 867, 93 S.Ct. 164, 34 L.Ed.2d 116 (1972):

A rebuttable presumption is a means by which a rule of substantive law is invoked to force the trier of fact to reach a given conclusion, once the facts constituting its

2. Act of April 14, 1972, P.L. 233, No. 64, § 28, 35 P.S. § 780–128, amended by Act of December 14, 1984, P.L. 988, No. 200, § 2, effective in 60 days.

hypothesis are established, absent contrary evidence.... An inference is not more than a logical tool enabling the trier of fact to proceed from one fact to another, if the trier believes that the weight of the evidence and the experiential accuracy of the inference warrant so doing. A rebuttable presumption forces the defendant to come forth or suffer inevitable defeat on the issue in controversy.

(Citation omitted); *see DiFrancesco, supra* 458 Pa. at 193, n. 3, 329 A.2d at 207, n. 3.

■ Section 780–128(a)(6)(ii) provides that money found in close proximity to an illegal controlled substance, as here, "shall be rebuttably presumed to be proceeds derived from the selling of" an illegal controlled substance, and no more. We agree with the trial court that the facts of this case rebut the inference which section 780–128(a)(6)(ii) mandates. As stated earlier, by presenting the fact that a set sum of money was drawn by appellee from a particular bank, and that a lesser sum was later found in appellee's possession in an envelope marked with the name of the same bank coupled with the fact that appellee had made no sale of drugs in the interim between the withdrawal and his arrest, we find it reasonable to conclude that the $1,950 found in the envelope was the remainder of the earlier draft and that the $1,950 could not be derived from an earlier sale of a controlled substance. This sufficiently rebuts the presumption raised by the discovery of the money in close proximity to the illegal controlled substance.

■ However, even without the support of the rebuttal presumption set forth in section 780–128(a)(6)(ii), we find merit to the Commonwealth's main contention that it proved by a preponderance of the evidence that the $1,950 is subject to forfeiture under section 780–128(a)(6)(i)(C) because the money was "used or intended to be used to facilitate any violation" of the Act.

The trial court concluded that the money to finance the trip to Florida and living expenses until appellant made the

first sale of cocaine was likely to have come from the partnership funds raised by appellant and his partner, rather than the $3,000 cash advancement appellant obtained from the Cleveland bank. The court based these conclusions on its reasoning that the equal partners raised "$40,-000," an amount well in excess of the $35,500 needed to purchase the cocaine, and that as equal partners the partnership would share in the expenses, making it unnecessary for appellant to expend any of his own $3,000 in furtherance of his drug transactions (Slip Op. at 4–5).

We are presented with a cold record in the sense that no testimony was given at the hearing and, therefore, no determinations of credibility were necessary by the hearing judge. Based on our review of the stipulated facts as presented by the attorneys during the hearing, we find no firm evidence that the partnership pooled a full $40,000 to finance the November, 1985 drug deal, which led to appellant's arrest. Instead, the only evidence presented was that appellant had used part of his $20,000 profit from an earlier drug transaction in September, 1985, from which he and his partner had split the profits equally—inferring that his partner had made a $20,000 profit also (N.T. 8/14/86, p. 4, 7). There is no evidence that each partner still possessed their full respective $20,000 profit more than two months later when appellant made the December, 1985 purchase. Therefore, the record does not disclose whether appellant had access to a sum from the prior drug deal larger than the $35,500 needed to purchase the kilo of cocaine in Miami.

There is, however, substantial evidence making it more likely than not that appellant used the $3,000 cash advance draft to finance his travel expenses to and from Florida and, in effect, facilitating the purchase and distribution of the cocaine in violation of the Act. On the same day appellant obtained the cash advance, he bought a one-way airline ticket to Miami, Florida. Upon reaching Florida, he rented a room under an alias as well as a four-door sedan which he used to transport the cocaine back to Cleveland.

After reaching Cleveland, he prepared the cocaine for sale and proceeded to Pittsburgh, where he made his first sale to Officer Blodgett. This entire transaction from the day he received the $3,000 until his arrest took approximately seven days. The fact that the $1,950 was found in close proximity to the receipts of the traveling expenses to Florida, as well as a large amount of cocaine, gives rise to a reasonable inference that the cash was the balance of the expense money appellant took on his trip. Appellant could not have known exactly how much money would be needed to make the trip and to deal with unforeseen circumstances, so he obtained an amount which would guarantee a financial cushion for the trip. For this reason we find the unspent amount equally facilitating a violation of the Act as did the money spent on actual expenses and subject to forfeiture under section 780–128(a)(6)(i)(C).

We have interpreted similar language in 35 P.S. § 780–128(a)(4), dealing with forfeitures of conveyances or vehicles used or intended for use "to transport, or in any manner to *facilitate* the transportation, sale, receipt, possession, or concealment of" drug paraphernalia or controlled substances in violation of the Act (emphasis added). In *Commonwealth v. One 1979 Lincoln, Four Door Sedan*, 344 Pa.Super. 171, 496 A.2d 397 (1985), *allocatur denied*, 513 Pa. 634, 520 A.2d 1384 (1987), we granted forfeiture of a motor vehicle used to deliver food and drink to co-conspirators at a clandestine laboratory, used for the manufacture of controlled substance, on the grounds that such use of the vehicle "facilitated" a violation of the Act. The same broad view applies to section 780–128(a)(6)(i)(C) and is consistent with the policy of our criminal law to deprive criminals of the fruits of illegal acts. *Landy, supra.*

Accordingly, Order reversed and remanded for further proceedings consistent with this Opinion.

Order reversed.