## Commonwealth v. $2,275 U.S. Currency

*Jerry J. Russo, assistant district attorney*, for the commonwealth.

*Timothy J. O'Connell*, for defendant.

DOWLING, *J.*, December 7, 1989 — We are here introduced to the Prussian version of "Lassie," a purebred male Weimaraner, named "Baron Von Schittler." His curriculum vitae is impressive. He is a graduate of the Narcotic Detector Dog School of the Bureau of Training and Education, Pennsylvania State Police Academy, where he maintained a 97-percent proficiency rating. During the year 1988, Baron was responsible for the confiscation of nearly three million dollars worth of drugs, cash, and property. At the Pennsylvania State Police Canine Association Police Dog Competition held at Hamburg, Pennsylvania on May 8, 1988, he was adjudged "top dog." He has been awarded the degree of Police Narcotic Dog (PND) by the Police K-9 Association of America. While he was not authored any articles or spoken at any prestigious gatherings, it is reliably rumored that TV and movie contracts are in the offing. This Rin Tin Tin of the

1980s is the chief character in the above case, for it was Baron who sniffed Mr. Hicks' roll.

It seems that Oswald Hicks was stopped for a traffic violation, and when a records search was made, arrested on an outstanding warrant for assault. A search of his person incident to his arrest yielded $2,275 composed of 110 bills in various denominations including 75 twenties. There were no controlled substances found on Mr. Hicks or in his vehicle. The money was confiscated and a check of the serial numbers did not reveal it to be controlled-buy money. On May 18, it was turned over to the Pennsylvania State Police, who arranged for "Baron" to perform a "cash scan" on the currency. The money was put in an envelope and placed alongside two similar but empty envelopes. The dog "alerted" to the envelope containing the respondent's money. Based on Von Schittler's response, the commonwealth filed a forfeiture complaint, seeking possession of the money pursuant to 42 Pa.C.S. §6801(a)(6)(i)(A) and (B) which provides:

"Money, negotiable instruments, securities or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance in violation of The Controlled Substance, Drug, Device and Cosmetic Act, and all proceeds traceable to such an exchange." 42 Pa.C.S. §6801(a)(6)(i)(A).

"Money, negotiable instruments, securities or other things of value used or intended to be used to facilitate any violation of The Controlled Substance, Drug, Device and Cosmetic Act." 42 Pa.C.S. §6801(a)(6)(i)(B).

The act further provides that:

"Such money and negotiable instruments found

in close proximity to controlled substances possessed in violation of The Controlled Substance, Drug, Device and Cosmetic Act shall be rebuttably presumed to be proceeds derived from the selling of a controlled substance in violation of The Controlled Substance, Drug, Device and Cosmetic Act." 42 Pa.C.S. §6801(a)(6)(ii).

This new Pennsylvania forfeiture statute replaced 35 Pa.C.S., subsection 780-128, 129 on July 1, 1988. Forfeiture proceedings under both statutes are civil in form but quasi-criminal in nature. Therefore, the commonwealth is required to prove its material allegations by a preponderance of the evidence. *Commonwealth v. Tate,* 371 Pa. Super. 611, 538 A.2d 903 (1988). This remains true whether or not the commonwealth is afforded the benefit of any rebuttable presumptions under the act. *Tate, supra.*

The commonwealth appears to be proceeding under two somewhat similar theories. At the time of the suppression hearing it seemed to be chiefly relying on the presumption that the money was found in close proximity to a controlled substance because of the scent of druges emanating from it. The act, however, requires that the money be found in close proximity to illegal substances for the presumption to arise.

There appears to be no authority in Pennsylvania as to whether the legislature intended this to mean close proximity in time rather than space, but there are decisions on point from other jurisdictions. In *Limon v. State,* 685 S.W.2d 515 (Ark. 1985), the Arkansas appellate court held that "in close proximity" under the Arkansas Controlled Substances Act, Ark. Stat. Ann. §82-2629(a)(6) (Supp. 1983), "simply means 'very near.'" 685 S.W.2d at 516 (1985). In *Ewachiw v. Director of Finance of Baltimore, Md.,* 70 Md. App. 58, 519 A.2d 1327 (1987), the Mary-

land appellate court specifically declined to define "close proximity" under Md. Ann. Code, Art. 27, §296(a)(6). The court likened close proximity to Justice Stewart's comment on pornography — "we do not define it, but we know it when we see it." 519 A.2d at 1330 (1987). This statement was in the context of moneys found on one floor of a house, while the majority of the contraband found was discovered on another floor. Once again, the "close proximity" referred to was *physical.*

The most illustrative case in this vein comes out of Illinois, pursuant to the Illinois Controlled Substance Act (Ill. Rev. Stat. 185 Ch. 56 1/2, par. 1505), the provisions of which are virtually identical to the provisions of the Pennsylvania act called into question here. In *Re $27,440,* 164 Ill. App. 3d 44, 115 Ill. Dec. 293, 517 N.E.2d 704 (3d Dist. 1987), a paper bag containing $27,440 in the form of 969 bills in U.S. currency was seized from the car of a drunk driver. The passenger in the car told the arresting officer that they had driven to a park in Springfield and that two paper bags were exchanged. A small amount of cocaine residue was found on the money.

Based on this evidence, the state attempted to have the money forfeited and tried to apply the close-proximity presumption. The trial court denied forfeiture based on this evidence and the appellate court affirmed the denial noting that, "At best the state's evidence invited speculation or surmise that someone might have delivered cocaine in a park in Springfield in exchange for the $27,440. But such conjecture is no substitute for proof, and is legally insufficient to support the conclusion that the requisite exchange took place . . . The purpose of the broad forfeiture provision is to control illegal trafficking in controlled substances, not to divest persons of all currency that happened to come into

contract with controlled substances at some earlier point in time. Clearly, the legislature intended the presumption to apply to situations where observable controlled substances or distributable paraphernalia, etc. are found in near proximity to currency. . . . " 517 N.E.2d at 706-7.

In its brief, the commonwealth emphasizes that Baron's "alert" to the money means that at some time the money was in proximity to drugs and that, like stolen property, once such a status is established, it is subject to forfeiture. Thus, the commonwealth argues that, from that point in time, no valid property right can come into evidence. This contention has a certain surface appeal for, in fact, no one knows how long the "scent of evil" can remain; despite the expression, money can't really be "laundered." However, if we carry the argument to its logical end, its delusive character is demonstrated. If, for example, the prosecuting attorney were to cash his paycheck at a local bank, and one of the bills received had at some time been tucked away in a bale of marijuana or stashed with cocaine packets, and if, as he left the bank, "Baron" came loping by and was "alerted," his hard-earned pay would be subject to forfeiture. Then there is the greengrocer whose store is in a high-drug area, and who might be unable to keep any cash which was not tainted with the baneful odor. We could go on and on, but res ipsa loquitur.

Legislation must be given a common-sense interpretation in light of the mischief to be remedied, the object to be obtained, and the consequences of a particular interpretation. There is, moreover, a presumption that the General Assembly does not intend a result that is absurd, impossible of execution, or unreasonable. 1 Pa.C.S. §§1921, 1922.

So, Oswald can keep his $2,275 and, if any

remains after counsel fees, invest it in United States bonds or give it to his favorite charity.

Accordingly, we enter the following

## ORDER

And now, December 7, 1989, the commonwealth's petition for forfeiture is denied.