## Commonwealth v. One 1973 Mercedes Benz Sedan

*Johnna Deily, assistant district attorney,* for the Commonwealth.

*Allen Welch,* for defendant.

HESS, *J.* November 21, 1990 — The Commonwealth has filed a notice of appeal from our order of court entered in this matter on August 24, 1990. In this case, we have granted the petition of the Commonwealth to forfeit one 1973 Mercedes Benz Sedan but have denied their petition to forfeit more than $12,000 in cash. This is a case where relatively small quantities of controlled substances were found in the Mercedes Benz Sedan but not in the immediate vicinity of the money. The money was oddly packaged but, otherwise, the question is whether it was traceable to an exchange of controlled substances or was intended to be used for the purchase of controlled substances[1] is at best the subject of the purest conjecture. The claimant and another witness testified that the cash came to the defendant as the result of his sale of a bulldozer.

Following the lodging of this appeal, we served upon the Commonwealth a notice to file a statement of matters complained of on appeal. The issue has been framed by the District Attorney as follows:

"Whether the trial court erred by failing to *consider* the narcotics dog indication and the method the money was packaged together as evidence to overcome the Commonwealth's burden by a preponderance of evidence that the money was furnished or intended to be furnished in exchange for a controlled substance?" (emphasis supplied)

We construe the Commonwealth's contention to mean that we erred in failing to *conclude* from the indication of the narcotics dog and the packaging of

---

1. Thus, making it subject to forfeiture pursuant to 42 Pa.C.S. §6801(a)(6)(i)(A) and (B).

the money, that the Commonwealth had met its burden that the money was furnished or intended to be furnished in exchange for a controlled substance.[2]

This question, of course, ignores the fact that even where the Commonwealth meets its burden the claimant may, notwithstanding, prove that the property was not unlawfully possessed by him. 42 Pa.C.S. §6802(j)(3). In this case, the claimant, Kirk Backstrom, testified that the money found in his car was the proceeds of the sale of a bulldozer to an acquaintance of his, Mr. Joseph Brady. Mr. Brady, himself testified, indicating that he had, indeed, purchased the bulldozer from Mr. Backstrom, paying $13,000 in cash. Both Backstrom and Brady testified that their transaction had taken place several days before Mr. Backstrom's car was searched on January 6, 1990. On that day, when Mr. Backstrom was first confronted by the police with respect to the money, he insisted that he had received it from Mr. Brady in exchange for the bulldozer. While we found certain details of Backstrom's testimony to be suspicious, we found his testimony concerning the sale of the bulldozer, corroborated by Mr. Brady, to be credible. We did so, in part, because there was no other explanation on the record.

We address the question posed by the Commonwealth, which is whether the packaging of the money together with the narcotics dog indication are sufficient to meet the Commonwealth's burden of proving, by a preponderance of the evidence, that

---

2. We can find no appellate cases suggesting that posttrial motions are required in forfeiture cases, though it strikes us that the vastly preferable procedure is to permit the trial court to address alleged error prior to the taking of an appeal.

the money was furnished or intended to be furnished in exchange for a controlled substance. We do this, keeping in mind that, in reality, it is virtually impossible to separate out the claimant's explanation from the other proofs of the case. At any rate, to conduct our analysis, a more detailed review of the facts is required.

As we have noted, this forfeiture proceeding arose out of events that occurred on January 6, 1990. Patrolman James L. Peterson of the North Middleton Township Police Department was on routine patrol when he observed a vehicle in a pull-off area of Route 944. For reasons not entirely clear, the officer approached the vehicle, in which Mr. Backstrom was the only occupant. The officer asked Backstrom whether there "was a problem." Backstrom indicated that he had just had a fight with his wife and was upset. At that point, Patrolman Mark Springer of the Middlesex Township Police pulled up to the scene, walked up to the passenger side of the vehicle, where he observed a spoon which appeared to have a cocaine-like substance on it. Mr. Backstrom was then removed from the car and the entire vehicle was searched.[3] In the vehicle, the patrolmen located a quantity of marijuana and some cocaine along with a large amount of money in a paper bag. The bag, with the money, was found underneath the passenger's seat. The packaging of the money was odd indeed. Mixed denominations of bills were packaged in small plastic bags which later were discovered to be baby bottle inserts.

The controlled substances were found elsewhere in the car. Specifically, in the driver's side door there was a pocket and within the pocket a paper towel roll. Within the paper towel roll, rolled up in

---

3. No argument has been made that the search transgressed constitutional limitations.

one paper towel, was a bag of marijuana. Also with the marijuana was a small baggie of cocaine and a piece of cooked, free-base cocaine. There were no controlled substances in the bag containing the money. There was, thus, no contention by the Commonwealth that the money was "in close proximity to controlled substances" so as to raise a rebuttable presumption that same were proceeds derived from the sale of controlled substances in accordance with 42 Pa.C.S. §6801(a)(6)(ii).

Following its seizure, the money was placed in a paper bag which, in turn, was located in a room which had been pre-checked for narcotics odors with negative results. The room was then searched by Woody, a three-year-old male golden retriever, trained in the location of narcotics odors. The response of the dog to the bag containing the money indicated that at least some of the cash had an odor of a controlled substance.

There is no question that the storage of large sums of money in baby bottle liners is somewhat unorthodox. As we have noted above, however, Mr. Backstrom accounted for his possession of the money and indicated, in any event, that he had no bank account and that all of his dealings were in cash. While there was Commonwealth testimony, from a Trooper Taylor, that during drug raids packaged sums of money are sometimes found, it is not necessarily packaged in baby bottle liners and in any event is usually packaged in specific amounts. In this case, the testimony of the Commonwealth was that the amounts of the various bags were mixed and non-specific.

Even though forfeiture proceedings are but quasi-criminal in character and do not require the full panoply of rights due a defendant in criminal proceedings, nonetheless the Commonwealth is re-

quired to prove the material allegations by a preponderance of the evidence. *Commonwealth v. Tate,* 371 Pa. Super. 611, 538 A.2d 903 (1988). While there is testimony in this case that Mr. Backstrom used drugs in January 1990, no testimony was adduced at our hearing of August 13,, 1990, which would indicate that he was a dealer. Even assuming that some of the money was intended to be furnished in exchange for a controlled substance, we have no way of knowing whether the amount so intended was $100 or $1,000 or $10,000. In short, the packaging of the money in this case in insufficient to establish that, more likely than not, any specific sum was furnished or intended to be furnished in exchange for a controlled substance.

The question then becomes whether the fact that some of the money emitted the odor of a controlled substance adds anything to the conclusion that it is subject to forfeiture. We believe not, for the reasons explained by Judge Dowling in *Commonwealth v. $2,275 U.S. Currency,* 4 D.&C. 4th 212 (1989). Because we cannot say it better than he does, we quote liberally from his opinion:

"We are here introduced to the Prussian version of 'Lassie,' a purebred male Weimaraner, named 'Baron Von Schittler.' His curriculum vita is impressive. He is a graduate of the Narcotic Detector Dog School of the Bureau of Training and Education, Pennsylvania State Police Academy, where he maintained a 97-percent proficiency rating. During the year 1988, Baron was responsible for the confiscation of nearly three million dollars worth of drugs, cash, and property. At the Pennsylvania State Police Canine Association Police Dog Competition held at Hamburg, Pennsylvania on May 8, 1988, he was adjudged 'top dog.' He has been awarded the degree of Police Narcotic Dog (PND) by the Police

K-9 Association of America. While he has not authored any articles or spoken at any prestigious gatherings, it is reliably rumored that T.V. and movie contracts are in the offering. This Rin Tin Tin of the 1980s is the chief character in the above case, for it was Baron who sniffed Mr. Hicks' roll. . . .

"In its brief, the Commonwealth emphasizes that Baron's 'alert' to the money means that at some time the money was in proximity to drugs and that, like stolen property, once such a status is established, it is subject to forfeiture. Thus, the Commonwealth argues that, from that point in time, no valid property right can come into evidence. This contention has a certain surface appeal for, in fact, no one knows how long the 'scent of evil' can remain; despite the expression, money can't really be 'laundered.' However, if we carry the argument to its logical end, its delusive character is demonstrated. If, for example, the prosecuting attorney were to cash his paycheck at a local bank, and one of the bills received had at some time been tucked away in a bale of marijuana or stashed with cocaine packets, and if, as he left the bank, 'Baron' came loping by and was 'alerted,' his hard-earned pay would be subject to forfeiture. Then there is the greengrocer whose store is in a high-drug area, and who might be unable to keep any cash which was not tainted with a baneful odor. We could go on and on, but res ipsa loquitur. . . .

"So, Oswald can keep his $2,275 and, if any remains after counsel fees, invest it in United States bonds or give it to his favorite charity." 4 D.&C. 4th at 212-3, 216, 217.

Similarly, we conclude that Kirk can keep his $12,198, but make no suggestions as to how he should spend it.