631 A.2d 710

COMMONWEALTH of Pennsylvania

v.

FIDELITY BANK ACCOUNTS, PSFS Meritor Bank Accounts, One 1986 Cadillac PA–LUP–937 Life Insurance Policy in 1429 South 18th Street, M. Carr, C. Carr and M. Carr,

Margie Carr, Appellant.

Appeal of COMMONWEALTH of Pennsylvania

v.

SAFETY DEPOSIT BOX, Fidelity Bank Accounts, One 1987 Nissan PA–PMP 613, 1239 South 10th Street, C. Carr, J. Hadley, M. Yeiser, J. Hadley, Life Insurance Policy in 1429 South 18th Street, G. Carter, G. Carter, M. Yeiser, M. Yeiser, M. Yeiser, M. Yeiser, Fidelity Bank Accounts Washington National Insurance Company Policies, J. Hadley,

Appeal of Maynetta YEISER, Appellant.

COMMONWEALTH of Pennsylvania

v.

FIDELITY BANK ACCOUNTS, PSFS Meritor Bank Accounts, One 1986 Honda PA–USC–717, 1239 South 20th Street, J. Hadley, M. Yeiser, J. Hadley, Life Insurance Policy in 1429 South 18th Street, M. Yeiser, M. Yeiser, Fidelity Bank Accounts Washington National Insurance Company Policies,

Appeal of John HADLEY, Appellant.

Commonwealth Court of Pennsylvania.

Argued Dec. 14, 1992.

Decided Aug. 23, 1993.

112

Joel Harvey Slomsky, for appellants.

George S. Leone, Asst. Dist. Atty., for respondent.

Before PALLADINO and FRIEDMAN, JJ., and NARICK, Senior Judge.

FRIEDMAN, Judge.

Margie Carr, Maynetta Yeiser and John Hadley appeal from an order of the Court of Common Pleas of Philadelphia which granted numerous petitions filed by the Commonwealth to forfeit property and ordered that the property in question

be transferred to the District Attorney of Philadelphia.[1] We affirm in part and vacate and remand in part.

That property subject to the Commonwealth's forfeiture petitions consisted of real estate, five automobiles, bank accounts and certificates of deposit, cash, numerous life insurance policies and various other items of personal property including jewelry, furs, camera equipment and electronics equipment.[2] The Honorable Francis Biunno, sitting without a jury,[3] conducted a hearing in the Court of Common Pleas of Philadelphia from October 9, 1990 to October 17, 1990. The Commonwealth presented the testimony of various witnesses and introduced over 160 exhibits. Carr, Yeiser and Hadley introduced no evidence except information concerning Clarence Carr's pension.

The Commonwealth's evidence, which was believed by the trial court, showed that Carr, Yeiser, Hadley[4] and numerous members of their extended family conducted an extensive operation, selling a cornucopia of drugs from a house owned by Clarence Carr and Margie Carr and located at 1242 S. 20th Street in the City of Philadelphia. The Commonwealth offered testimony in which witnesses described lines of individu-

1. 42 Pa.C.S. § 6801(e) provides in pertinent part that "[w]henever property is forfeited under this chapter, the property shall be transferred to the custody of the district attorney ... or the Attorney General...." 42 Pa.C.S. § 6801(e).

2. In addition to the property that is the subject of this appeal, the police, on a number of occasions, seized drugs possessed by various individuals in violation of The Controlled Substance, Drug, Device and Cosmetic Act (The Act), Act of April 14, 1972, P.L. 233, *as amended*, 35 P.S. §§ 780–101 to 780–144.

3. In *Commonwealth v. One (1) 1984 Z–28 Camaro Coupe*, 530 Pa. 523, 610 A.2d 36 (1992), the court held that a jury trial was required whenever requested by the owner of the property subject to the forfeiture.

4. Clarence Carr, deceased by the time of the hearing, had been married to Margie Carr, who was appointed administratrix of her late husband's intestate estate. Maynetta Yeiser is their daughter and is married to John Hadley; Yeiser and Hadley have two children from their marriage. Yeiser also had five children from a prior marriage, some of whom were mentioned at the hearing in the Commonwealth's evidence.

als waiting on the sidewalk to gain admittance to the houses [5] to purchase drugs illegally. Needless to say, that evidence tied Carr, Yeiser and Hadley, as well as numerous other family members, to the illegal drug trafficking operation. The trial court made the following relevant findings of fact:

1. The structure at 1242 S. 20th Street in Philadelphia is, by all outward appearances, a row house. It is not a storefront or commercial property.

2. The traffic of people in and out of the house at 1242 S. 20th Street has been constant and heavy since 1981. Twenty-four hours per day, seven days a week, people go into the house, stay a minute or two, and leave. The flow ranges from a dozen or so per hour to seventy-five per hour....

3. During this period, the house at 1242 S. 20th Street was owned by Clarence Carr. He sold the house on October 22, 1988 to his wife, Margie Carr, for one dollar....

4. On numerous occasions, police have seized jars full of codeine syrup and pills from people exiting 1242 S. 20th Street....

5. On numerous occasions, police have seized illegal pills, codeine syrup, marijuana, and cocaine in and around the house at 1242 S. 20th Street....

6. On numerous occasions, undercover police have purchased pills, codeine syrup, marijuana, and cocaine in and around 1242 S. 20th Street....

7. In just over six years (May 1983—June 1989), police have purchased or seized drugs eighteen times inside 1242 S. 20th Street....

8. Pharmaceuticals sold illegally from 1242 S. 20th Street came, in part, from Milicia Pharmacy in South Philadelphia. The drugs were purchased at the pharmacy by Maynetta [Yeiser], her husband, John Hadley, and her sister Linda Carr. They bought nine thousand dollars in pills and syrup from the pharmacy each week for six years.

5. After the sales operation at 1242 S. 20th Street was shut down by the police, it was moved to a different location.

They always paid cash for their nine thousand dollar purchase (sic)....

9. From 1983 to 1989, various members of the Carr family repeatedly sold or helped in the continuous sale of illegal drugs. Activities which aided the sale of drugs included purchasing drugs from pharmacies, resupplying the sales house from the 'stash' house, secreting supplies of drugs or cash, acting as a lookout or doorkeeper, directing customers, and cutting and packaging drugs. The family members involved spanned three generations, including *Clarence Carr,* ... *Margie Carr,* ... *John Hadley,* ... *Maynetta [Yeiser],* ... *Linda Carr,* ... *Richard Carr,* ... *Lonnie Carr,* ... *Silas Carr,* ... *Nakia Carr,* ... *Gary Yeiser,* ... and *Karen Yeiser.* ... Drug sales from 1242 S. 20th Street were controlled and operated by the Carr family.

10. To avoid police seizure, drug supplies and proceeds were stored away from 1242 S. 20th Street. Money and other valuables received as drug proceeds were hidden at 1239 S. 20th Street and drugs were stored at 1241 S. 20th Street....

11. After police searched these three houses in 1988, the hiding locations changed. Drug proceeds were then secreted at 1429 S. 18th Street and drugs were stored at 1927 Latonia Street, 2017 Manton Street and 1241 S. 20th Street....

12. When the house at 1242 S. 20th Street was sealed by court order in June, 1989, the sales location shifted to 2035 Wharton Street but trafficking continued just the same. Real estate titles were transferred for one dollar to hide their true ownership. Certificates of deposit were also closed to prevent seizure....

13. The family used rented cars, borrowed cars, and many of their own cars to ferry drugs and money between the various houses....

14. The family drug sales operation produced over one million dollars per year in profit from the sale of illegal

pharmaceuticals alone not including profits from marijuana and cocaine....

15. During the 1980s, members of the family invested money in certificates of deposit, savings and checking accounts, and life insurance and annuity policies. They also purchased houses, cars, furs, jewelry, electronics and camera equipment, and hundreds of thousands of dollars in other consumer items.

16. During this period, the family spent more than $450,000 to buy pharmaceuticals from one pharmacy. This does not include the cost of the marijuana, cocaine, and drugs purchased from other pharmacies....

17. The only evidence of legitimate income for the two main claimants, John Hadley and Maynetta [Yeiser], is rental payments. Subtracting the money spent on property repairs, these two claimants had no income and suffered a thirty thousand dollar loss over four years....

18. The only evidence of legitimate income for the third claimant, Margie Carr, is that Clarence Carr had a pension which paid less than ten thousand dollars per year....

19. There was no evidence of legitimate funding for any of the assets claimed by Maynetta [Yeiser] and John Hadley for themselves or their children....

20. The pension evidence presented is insufficient to prove the legitimate source of funds and property claimed by Margie Carr....

21. The cash and funds held in certificates, accounts, policies, and annuities seized by the Commonwealth came from drug sales. These assets were also used for use to keep drugs flowing to the family for sale to customers and to maintain their lifestyle so that other funds could be used for buying drugs....

22. The houses at 1242 S. 20th Street, 1927 Latonia Street, 1241 S. 20th Street, and 1239 S. 20th Street were used to sell drugs or to secrete drugs or drug proceeds (the houses at 1242 S. 20th Street and 1927 Latonia Street have

already been forfeited). The house at 1239 S. 20th Street was also purchased with money from drug sales....

23. The autos seized by the Commonwealth were used to carry drugs and drug money to and from hiding locations. The cars belonging to Clarence Carr, Maynetta [Yeiser], and John Hadley were also purchased with drug money....

24. The miscellaneous property seized by the Commonwealth was received in exchange for drugs, bought with drug money, and/or held for later exchange for drugs....

(Opinion of the trial court, pp. 2–8, 7/9/91) (emphasis in original). The court concluded that all of the property at issue was subject to forfeiture because it was either used to facilitate the sale of drugs or because it was the proceeds from the sale of those drugs. Carr, Yeiser and Hadley each appealed to the Superior Court of Pennsylvania, which transferred the appeals to this court. By order of December 11, 1991, we consolidated the three individual appeals.

Carr Yeiser and Hadley do not argue that any of the *specific* factual findings quoted above lack support in the voluminous record.[6] Rather, they all present the same argument, i.e., that the evidence presented was insufficient to support the court's order forfeiting all of the property. They essentially argue that before the court may properly order the forfeiture of the seized property, the Commonwealth was required to prove that Carr, Yeiser or Hadley purchased each

6. The Commonwealth introduced no evidence that any members of the Carr family were convicted of any crimes relating to the drug trafficking operation; in fact, mention is made at times that certain family members were acquitted of particular drug charges. Nonetheless, in neither their brief to the trial court nor in the brief filed in this court have any of the appealing parties ever argued that lack of criminal convictions somehow affects the legitimacy of the forfeiture orders. Furthermore, while attorneys for Carr, Yeiser and Hadley argued before the trial court that these proceedings were criminal in nature and thus subjected the Commonwealth to a higher burden of proof, they now concede in their brief that the Commonwealth's burden of proof is that of preponderance of the evidence. Finally, we believe it is important to note that the Carrs never argued that the forfeitures in this case were violative of the excessive fines clause of the Eighth Amendment to the United States Constitution. *See Austin v. United States,* —— U.S. ——, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993); *Alexander v. United States,* —— U.S. ——, 113 S.Ct. 2766, 125 L.Ed.2d 441 (1993).

and every item of property with the ill-gotten gains from the drug trafficking operation and not with funds derived from legitimate sources. With a few minor exceptions, we cannot accept the argument of Carr, Yeiser and Hadley.

In *Commonwealth v. $15,836.85–Cash,* 354 Pa.Superior Ct. 279, 511 A.2d 871 (1986), the court made clear that findings of fact by a judge in a bench trial are entitled to the same deference as a jury verdict and so can be reversed on appeal only if the record lacks evidence to support those findings. It is axiomatic that in a bench trial the trial court is the factfinder; with that function goes the power to decide which witnesses are credible and to draw any reasonable inferences from all of the evidence. *Commonwealth v. One 1985 Cadillac Seville,* 371 Pa.Superior Ct. 390, 538 A.2d 71 (1988). We remain cognizant of these limitation throughout our review.

The Legislature has provided:

(a) **Forfeitures generally.**—The following shall be subject to forfeiture to the Commonwealth and no property right shall exist in them:

. . . .

(4) *All conveyances, including* aircraft, *vehicles* or vessels, *which are used or intended for use to transport, or in any manner to facilitate the transportation, sale, receipt, possession or concealment* of [controlled substances and related materials which violate The Controlled Substance, Drug, Device and Cosmetic Act, (The Act), Act of April 14, 1972, P.L. 233, *as amended,* 35 P.S. §§ 780–101—780–144]:

. . . .

(6)(i) All of the following:

(A) Money, negotiable instruments, securities or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance in violation of [The Act], *and all proceeds traceable to such exchange.*

(B) Money, negotiable instruments, securities or other things of value *used or intended to be used to facilitate* any violation of [The Act].

(C) Real property *used or intended to be used to facilitate* any violation of [The Act], including structures or other improvements thereon....

42 Pa.C.S. § 6801 (emphasis added).[7]

Based upon this legislation, the Superior Court has described two classes of property subject to forfeiture as follows:

Property subject to forfeiture includes items which are illegal per se and which have been denoted contraband. Also subject to forfeiture is property which *has been derived from or used in furtherance of* illegal activity, such as money derived from the illegal sale of drugs. This is known as *derivative contraband.*

*Commonwealth v. One 1985 Dark Blue Mercedes Benz Car*, 391 Pa.Superior Ct. 507, 513, 571 A.2d 482, 484, *petition for allowance of appeal denied*, 526 Pa. 654, 586 A.2d 922 (1990) (emphasis added). All of the property subject to these appeals was forfeited as "derivative contraband", the trial court holding that the property involved was (1) property which was used to further the drug trafficking operation and/or (2) property that represented the proceeds from that illegal activity. Both 42 Pa.C.S. § 6801(a) and case law support the trial court's holding that these types of property are subject to forfeiture.

█ Whether dealing with automobiles, money or real property, all are forfeitable if used or intended to be used to facilitate a violation of The Act; we cite only a few of many examples. In *Commonwealth v. One 1979 Lincoln Four Door Sedan*, 344 Pa.Superior Ct. 171, 496 A.2d 397 (1985), *petition for allowance of denied*, 513 Pa. 634, 520 A.2d 1384 (1987), the court upheld the forfeiture of an automobile where the owner used the car to deliver aspirin, vaseline, sandwiches and coffee

7. Prior to the enactment of this section, forfeiture was covered in the former sections 28 and 29 of The Act, formerly 35 P.S. §§ 780–128 & 129; those two sections were repealed and replaced by 42 Pa.C.S. §§ 6801–02. In many instances, the cases cited in this opinion interpret the repealed sections of The Act. Because both the present and former forfeiture provisions are substantially similar, we believe that the cases interpreting the repealed provisions are nonetheless valid authority for the provisions of 42 Pa.C.S. §§ 6801–02.

to co-conspirators who were illegally manufacturing methamphetamine. The court held that such conduct *facilitated* the illegal activity. Furthermore, the Superior Court has held that cash remaining after paying the expenses of a trip to purchase cocaine was subject to forfeiture as facilitating that illegal venture. *Commonwealth v. Tate,* 371 Pa.Superior Ct. 611, 538 A.2d 903 (1988). Finally, we have upheld the forfeiture of a house where undercover police purchased cocaine and later seized cocaine and various drug paraphernalia in a subsequent search of the house. *In re King Properties,* 145 Pa.Commonwealth Ct. 139, 602 A.2d 486 (1992), *petition for allowance of appeal granted,* 533 Pa. 620, 619 A.2d 701 (1993).[8]

42 Pa.C.S. § 6801(a)(6)(i)(A) requires the forfeiture of "all proceeds traceable" to an exchange of a controlled substance for anything of value. Based upon this provision, the Superior Court upheld the forfeiture of over $130,000 in cash and two one ounce gold bars seized from a safety deposit box of a convicted drug dealer. *Commonwealth v. $126,730.50,* 399 Pa.Superior Ct. 118, 581 A.2d 953 (1990). *Accord Commonwealth v. $1920.00 U.S. Currency,* 149 Pa.Commonwealth Ct. 132, 612 A.2d 614 (1992).

Whenever the Commonwealth seeks an order forfeiting property, it bears the initial burden of proving by a preponderance of the evidence [9], *Commonwealth v. One 1988 Suzuki Samurai,* 139 Pa.Commonwealth Ct. 68, 589 A.2d 770 (1991), that "the property in question was unlawfully used, possessed or otherwise subject to forfeiture under section 6801(a)". 42 Pa.C.S. § 6802(j). Put another way, the Commonwealth must establish a nexus between the illegal activity

**8.** In *King Properties,* the trial court had ordered that the owner be permitted to redeem his interest in the house by paying $30,000 to the Commonwealth. We held that the trial court erred in permitting the redemption.

**9.** In *Commonwealth v. Landy,* 240 Pa.Superior Ct. 458, 362 A.2d 999 (1976), the court decided that while forfeiture proceedings were "quasi-criminal in character", *id.* at 469, 362 A.2d at 1005, "[o]n issues of evidence, such proceedings shall be treated as civil proceedings with the Commonwealth having the burden of proving the material allegations by a preponderance of the evidence." *Id.*

and the property subject to the forfeiture. *In re King Properties*. The Commonwealth in the present case was required to prove only that it was "more likely than not", *Commonwealth v. One 1988 Ford Coupe VIN# 1FABP41A9JF143651*, 393 Pa.Superior Ct. 320, 333, 574 A.2d 631, 638 (1990), *petition for allowance of appeal denied*, 527 Pa. 631, 592 A.2d 1299 (1991), that the property in question either was used in the drug trafficking operation or was the proceeds traceable to that operation. Once the Commonwealth meets that initial burden of proof,

the burden shall be upon the claimant to show:

(1) That the claimant is the owner of the property. . . .

(2) That the claimant lawfully acquired the property.

(3) That it was not unlawfully used or possessed by him. In the event that it shall appear that the property was unlawfully used or possessed by a person other than the claimant, then the claimant must show that the unlawful use or possession was without his knowledge or consent. Such absence of knowledge or consent must be reasonable under the circumstances presented.

42 Pa.C.S. § 6802(j).

■ Here, the Commonwealth argues that it met its initial burden of proving that the seized property was "more likely than not" the proceeds of illegal drug sales by its showing that Carr, Yeiser and Hadley had accumulated assets far in excess of their legitimate income. We agree.

In *Commonwealth v. Graham*, 334 Pa.Superior Ct. 170, 482 A.2d 1277 (1984), the police, pursuant to a warrant, conducted a search of Graham's residence after an informant bought marijuana at the behest of police. During the search, the officers discovered twenty-six pounds of marijuana, 2288 tablets of LSD, a sophisticated electronic scale, three guns and over $33,000 in cash. The trial court ordered that the cash be forfeited as the proceeds of illegal drug sales. The Superior Court affirmed, noting first that the evidence established that Graham was in the business of selling drugs. The court then stated:

> Although not dispositive of the case, one cannot ignore the evidence that neither [Graham] nor his wife held steady jobs. Mrs. Graham had been employed at minimum wage for three unconsecutive (sic) years. As for [Graham], he received a disability payment of $400 a month, had not worked for approximately 5 years prior to his arrest and was supporting a family of three on his disability check. Yet the Grahams managed to own several vehicles and some 19 guns.

*Id.* at 183 n. 1, 482 A.2d at 1284 n. 1.

Similarly, in *Lappas v. Brown,* 335 Pa.Superior Ct. 108, 483 A.2d 979 (1984), the trial court ordered that $1450.00 in cash, seized along with quantities of marijuana, be forfeited as proceeds from illegal drug sales. Again, the Superior Court noted that the record showed that Brown was involved in the sale of drugs. The court then stated, "Most convincing, however, was the admission of [Brown's] bank statement which tended to refute his statement that he received no other income than his employment wages.... The statements showed deposits in excess of that amount which would represent his wages." *Id.* at 117, 483 A.2d at 984 (citations to the record omitted).

The Commonwealth's evidence in this case clearly showed that the Carr family, *specifically Carr, her late husband, Yeiser and Hadley,* engaged in a massive drug trafficking operation generating huge profits for a number of years. Carr, Yeiser and Hadley do not argue in their brief that the Commonwealth failed to prove the existence of such an operation. Rather, their argument is that the Commonwealth's evidence fell short of proving that the property constituted proceeds of the operation, thus subject to forfeiture.

In this regard, the Commonwealth presented the federal tax returns for Yeiser and Hadley for the years 1986 through 1989. In 1986, they reported income of $12,813, and in the subsequent years reported income of $19,132 (1987), $27,141 (1988) and $10,807 (1989). Carr introduced evidence that she and her late husband received a pension of approximately

$10,000, commencing in 1979. In addition to the proof of Yeiser and Hadley's tax returns, the Commonwealth was also able to prove that Yeiser and Hadley spent $78,148 in 1986, $147,700 in 1987, $70,165 in 1988, $210,102 in 1989 and $120,-461 in 1990.[10] The Commonwealth obtained these figures from records of real estate purchases, cancelled checks, receipts from purchases made with cash and other sources.

Furthermore, the Commonwealth seized four parcels of real estate.[11] In its various searches, the Commonwealth seized almost $150,000 in cash, discovered life insurance policies with cash surrender values totalling almost $65,000 and seized certificates of deposit and froze bank accounts totalling almost $170,000. Totalling these three categories, one can see that the police seized over $385,000 in cash and items readily convertible into cash. Furthermore, the Commonwealth seized five automobiles: a 1987 Nissan Maxima, a 1986 Honda Civic, a 1986 Cadillac, a 1986 Ford Tempo and a 1985 Cadillac Fleetwood. The Commonwealth also seized three fur coats, a number of pieces of gold jewelry along with camera and electronics equipment.

Based upon the vast disparity between the accumulated assets and any legitimate income of Carr, Yeiser and Hadley, we believe that the Commonwealth met its burden of proving that most of the seized property [12] was "more likely than not" the proceeds of illegal drug sales. That being so, the burden shifted to Carr, Yeiser and Hadley to prove that the property was lawfully acquired and that the property was not unlawfully used or possessed. 42 Pa.C.S. § 6802(j).[13] Yet, aside from

10. The Commonwealth did not introduce a tax return for 1990 as this hearing was held in October 1990, before Yeiser and Hadley were required to file that return.

11. Yeiser and Hadley contest only the forfeiture of their property at 1239 S. 20th Street. Carr does not challenge the forfeiture of any of her real estate.

12. We shall discuss later that property which was purchased or accumulated prior to the time that the Commonwealth was able to show the existence of a drug trafficking operation.

13. The defense under section 6802(j) is often referred to as the "innocent owner" defense; we believe, however, that the term is at times

Carr's evidence concerning the pension received by her and her late husband, Carr, Yeiser and Hadley offered no evidence attempting to meet their burden under 42 Pa.C.S. § 6802(j).

In *Commonwealth v. Doranzo*, 365 Pa.Superior Ct. 129, 529 A.2d 6, *petition for allowance of appeal denied*, 517 Pa. 614, 538 A.2d 497 (1987), the Commonwealth presented evidence that Doranzo was engaged in a "fencing" operation in proceedings to forfeit property seized from five properties owned by him. The trial court refused to forfeit the property, holding that the Commonwealth had failed to meet its burden of proving that the property was linked to criminal activity. The Superior Court reversed, stating in pertinent part:

> Proof by a preponderance of the evidence is often alluded to as a weighing of the evidence and a determination based upon which way the scales are tipped. The Commonwealth's evidence, in our opinion, tips the scales heavily in its direction. Conversely, [Doranzo] chose not to enter any evidence on his behalf while hiding behind what he believed to be a difficult burden to overcome. *While [Doranzo] was not obligated to present evidence to support his position, his refusal to do so left the mythical scales tipped in the Commonwealth's favor and compels a determination in its favor.*

*Id.* at 133–34, 529 A.2d at 8 (emphasis added). We believe this analysis to particularly apt to the present facts.

used too broadly. Clearly, one who attempts to prove that his or her property was used for illegal activity by another, would be attempting to prove that he or she was an innocent owner. Nonetheless, even one who has been convicted of a drug violation may have property returned if that person can prove that property was legally acquired, used and possessed. For example, in *Commonwealth v. Giffin*, 407 Pa.Superior Ct. 15, 595 A.2d 101 (1991), the police seized $1266 when Giffin was arrested and charged with drug violations to which she pled guilty. She testified that she had cashed a $411 welfare check two days before her arrest. She also testified that her paramour's brother had given her $1000 to pass on to her paramour, who was out of town. The brother corroborated that testimony, explaining that he had recently obtained $27,000 in the settlement of a disability claim. The trial court believed that testimony and held that the testimony was sufficient to overcome the fact that the Commonwealth met its initial burden; the Superior Court affirmed the trial court's order that the money be returned to Giffin.

Carr argues that her proof of the $10,000 annual pension is, without more, sufficient as a matter of law to require that some of the property be returned to her. Carr essentially argues that her legitimate income, in the form of her late husband's pension, could have been the source of her property which was seized and subsequently forfeited. The First Circuit rejected similar argument in *United States v. Parcel of Land,* 903 F.2d 36 (1st Cir.1990), *cert. denied,* 498 U.S. 916 (1990). There, the property owner had made purchases of more than $1,000,000 during a period when he had legitimate income of approximately $30,000. As the court explained:

We also reject [the property owner's] implied argument that so long as he had any legitimate source of income, no matter how insignificant in comparison to his expenditures, the government could not forfeit the defendant properties without showing a specific link between the properties and particular drug transactions. We recognize that courts typically list as a consideration the fact that a claimant had 'no' legitimate source of income. We would be *ignoring* common sense, however, if we read this 'no income' language literally. [The property owner's] legitimate annual income of $27,690 was so trivial in comparison to his millions of dollars in expenditures that for all intents and purposes, he had no legitimate source of income.

*Id.* at 42 (footnote omitted).

■ At issue now are bank accounts totalling over $3600.00, a certificate of deposit worth $6,000.00, life insurance policies with a cash surrender values amounting to $900.00, cash of almost $8300.00 seized in two separate searches of the Carr's properties, jewelry and electronic equipment seized at the second search, the 1985 Cadillac Fleetwood and the Carr's real estate at 1242 S. 20th Street.[14] Given Carr's income and the relatively modest amount of her assets involved, Carr would have had to offer an explanation as to the lawful acquisition of these assets before the trial court, as factfinder, could have found that the assets had been lawfully acquired; Carr, how-

14. The real estate had been forfeited prior to the court's forfeiture order presently under review.

ever, offered no such explanation and the trial court could not have made such a finding based solely on Carr's proof of income. Accordingly, there was evidence to support the trial court's decision that Carr's property was forfeitable.[15]

Carr, Yeiser and Hadley argue that certain of the property which was seized should not be forfeited because no drugs were ever confiscated in the searches that led to the seizures in question. Although the record supports the assertion that no drugs were seized during those searches, this fact is of no moment in our analysis. Carr, Yeiser and Hadley do not clearly state the significance of this fact. We note that in *Giffin*, the court stated that money found in close proximity to illegal drugs is presumed to be the proceeds from the sale of drugs. However, the Commonwealth in the present case does not require the use of that presumption to prove that the property was subject to forfeiture. As stated, the Commonwealth met its initial burden of proof on the question of proceeds by establishing that the assets of Carr, Yeiser and Hadley greatly exceeded any legitimate source for those assets. We thus reject this argument.

Carr, Yeiser and Hadley have asserted throughout their brief that property may not be forfeited as proceeds unless *directly* traceable to an illegal sale of drugs. In *Landy*, the Superior Court did state that "money proceeds directly derived from and directly traceable to the sale of a controlled substance ..., a criminal act, are 'derivative contraband' subject to forfeiture." *Id.* at 465, 362 A.2d at 1002. The argument of Carr, Yeiser and Hadley, in effect, would require the Commonwealth to follow the money and establish a chain of custody, a burden which we do not believe case law requires. In fact, in *Doranzo*, the Superior Court specifically rejected the trial court's analysis that forfeiture was unwarranted because the Commonwealth could not offer such "direct" proof.

**15.** Furthermore, we cannot forget that Yeiser and Hadley offered not one iota of evidence in this regard so that their claim for relief is even more tenuous than Carr's.

Carr, Yeiser and Hadley cite to *One 1985 Dark Blue Mercedes* for the proposition that property does not acquire "guilt by association" simply because the property is owned by a criminal. In that case, the Superior Court reversed an order of the trial court forfeiting an automobile when the evidence showed *only that the auto was owned by an individual who had engaged in criminal conduct.* As the court explained:

A Mercedes Benz vehicle is not illegal per se. Although it can be derivative contraband *if it is connected with illegal drug activity,* in this case the Commonwealth failed to offer even a scintilla of evidence that the Mercedes automobile had been used in the conduct of or to further illegal drug transactions. Similarly, *it failed to show that proceeds of illegal drug transactions had been used to purchase the Mercedes vehicle.* There was, in short, *no proof of any nexus between criminal drug activity and the vehicle....*

*Id.* at 514, 571 A.2d at 485 (emphasis added). This rationale is not applicable here. The Commonwealth has proved that all of the seized property was more likely than not the proceeds of illegal drug transactions; this property was not forfeited because of guilt by association.

 Yeiser and Hadley next argue that the trial court improperly ordered the forfeiture of certificates of deposit in the individual names of their children. They claim that since there was *no evidence of any illegal drug activity on the part of the children,* forfeiture was unwarranted. Assuming *arguendo* that the children did not engage in any illegal activity, testimony was necessary to overcome the presumption that these monies were proceeds from illegal drug transactions because of assets greatly in excess of any legitimate source for those assets. Suffice it to say that no testimony was offered by Yeiser, Hadley or the children and this argument must be rejected.

 Finally, Carr, Yeiser and Hadley point out that eight of the insurance policies were purchased and one of the bank accounts opened prior to that point in time that the

Commonwealth was able to prove the existence of a drug trafficking operation and should not be subject to forfeiture. Our review of the evidence shows that Louis Pisano, a pharmacist at Milicia's pharmacy, began working there in August of 1982. He testified that he filled various prescriptions made out to numerous individuals, all of which were brought in on a daily basis by members of the drug trafficking operation. In the context of the present case, the Commonwealth, in order to prove that property is forfeitable, had to prove that the property was the proceeds of the drug trafficking operation. We believe that as a matter of law, the Commonwealth cannot prove that property acquired *prior to the time that it proves that illegal activity occurred* is forfeitable as proceeds of that illegal activity; all monies deposited into the bank account or paid into insurance policies prior to August 1982 must be returned.[16]

From the record, we cannot ascertain whether the Commonwealth offered any proof that premiums were paid on the insurance policies or deposits made into the one savings account after August of 1982, the earliest date on which the Commonwealth was able to prove that the illegal drug trafficking operation was in existence. There is no explicit testimony on this question but the Commonwealth did introduce over 160 exhibits, none of which are a part of the record on appeal. We believe that if the Commonwealth failed to prove such payments at the hearing, any monies paid into either the bank account or insurance policies after August 1982 must also be returned. Further, even if the Commonwealth did prove that such post-August 1982 payments were made, Carr, Yeiser or Hadley remain entitled to pre-August 1982 payments. Therefore, because any payments prior to the crucial date must be segregated from the forfeitable funds and returned, we remand for the trial court to determine [17] if the Common-

16. The Commonwealth also seized the contents of a safety deposit box which had been opened in 1976 and transferred to a larger box in 1981. Since the Commonwealth was able to prove entry into that box as late as 1986, it need not be considered on remand.

17. We make clear that the Commonwealth is *not* being given a second opportunity to meet its burden of proof.

wealth proved any post August 1982 payments.[18]

## ORDER

AND NOW, this 23rd day of August, 1993, the July 10, 1991 order of the Court of Common Pleas of Philadelphia at Nos. 89–991297—89–991307, 89–991600, 89–991765, 89–992152—89–992153, 89–992155, 89–992163, 89–992171—89–992172, 90–990142, 90–990430—90–990431, 90–990479—90–990514, 90–990534, 90–990634, 90–990692—90–990693 and 90–991407 is affirmed except insofar as it relates to the insurance policies numbered NYL 36–946–333, NYL 40–069–259, NYL 40–069–270, NYL 40–069–280, NYL 40–069–285, NYL 40–069–292 and NYL 40–175–871 and the PSFS Meritor bank account # 4–07128420. Insofar as the order relates to the insurance policies and the bank account, the order is vacated and the matter is remanded for the court to determine if the Commonwealth has proved that any monies were paid as premiums on the insurance policies or deposits were made after August 1982. After making such determination, the court shall order that the property either be returned or forfeited in accordance with this opinion.

Jurisdiction relinquished.

---

18. Because of our disposition on the question of "proceeds", we need not discuss, except as follows, the trial court's findings of fact that some of the forfeited property was used to facilitate the trafficking operation. In finding of fact # 21, the court stated:

> The cash and funds held in certificates, accounts, policies, and annuities seized by the Commonwealth came from drug sales. These assets were also used to keep drugs flowing to the family for sale to customers and to maintain their lifestyle so that other funds could be used for buying drugs....

(Opinion of the trial court, 7/9/91.) Our discussion shows that the property subject to the remand order cannot be forfeitable as proceeds *if it was acquired prior to August 1982.* That property, similarly, cannot fall within the trial court's finding concerning "these assets".