### COMMONWEALTH of Pennsylvania

### v.

### $23,320.00 U.S. CURRENCY.

### Lludin Palmer, Richard Myers and Michael Gibson, Appellants.

Commonwealth Court of Pennsylvania.

Argued April 15, 1999.
Decided July 2, 1999.

Peter B. Foster, Harrisburg, for appellants.

Marianne Kreisher Fogelsanger, Harrisburg, for appellee.

Before SMITH, J., FRIEDMAN, J., and KELLEY, Senior Judge.

SMITH, Judge.

Lludin Palmer, Richard Myers and Michael Gibson (Appellants) appeal from an order of the Cumberland County Court of Common Pleas that granted the Commonwealth's petition for the forfeiture of $23,320 in United States currency confiscated during a traffic stop on the Pennsylvania Turnpike from a vehicle driven by Myers. Appellants present three issues for the Court's review: whether the Commonwealth produced sufficient evidence that the cash seized is related to a crime to justify forfeiture; whether the trial court erred in drawing a negative inference from Gibson's assertion of his United States Constitution Fifth Amendment privilege against self incrimination; and whether the United States Supreme Court's decision in *United States v. Bajakajian*, 524 U.S. 321, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998), prevents forfeiture in this case.

## I

On December 24, 1997, Myers and Palmer were stopped on the Pennsylvania Turnpike by State Trooper Anthony Todaro for traveling in excess of the speed limit. Trooper Todaro requested that Myers produce a driver's license and registration. Myers produced a Florida driver's license and a rental agreement which reflected that Palmer, the front-seat passenger, had rented the car. Palmer then produced his New York driver's license at the trooper's request. Trooper Todaro ran checks of the licenses, and after ascertaining that no warrants were outstanding, he issued Myers a warning about his speeding. During further questioning, Myers stated that he and Palmer had spent the last three days in Pittsburgh and that they were en route to New York but had no luggage. The trooper obtained permission to search the vehicle.

Trooper Todaro requested the aid of Corporal Stephen Shelley who surveyed the vehicle with a narcotics canine. This search resulted in three "alerts," which is the term used when a drug-detection canine indicates that there is an odor of marijuana, cocaine, heroin or other derivatives. The alerts occurred near the glove compartment, near the back seat and near a shopping bag in the trunk. The alert near the bag was strong, and the officers opened the bag to discover the currency confiscated in this case. The currency was packaged in 7 bundles comprised of 24 sub-bundles, each containing approximately $1000. The officers questioned Myers and Palmer separately about the origin of the currency. Palmer stated that the money was his and that he had borrowed it from his uncle in order to purchase, repair and resell a damaged vehicle. Myers stated that $10,000 was his and the rest belonged to Palmer.

Because of the discrepancy in the statements given by Myers and Palmer, the officers seized the currency pending further investigation and returned to the state police barracks with Myers and Palmer. The cash was subjected to a more detailed examination by the narcotics canine, and the test again revealed a strong alert for a drug odor. Meanwhile, Appellants were separately interviewed by Trooper Jay Lownsbery, a narcotics spe-

cialist. Palmer again stated that his uncle had loaned him the money to buy a vehicle and that he and Myers had looked at a Toyota land cruiser but decided not to purchase it. In contrast, Myers stated that they examined a damaged Honda Civic for purchase. Trooper Lownsbery then attempted to contact Palmer's stated employer, but neither of the two telephone numbers that Palmer had given was correct. The trooper also contacted Gibson, the man whom Palmer described as his uncle. Gibson denied that Palmer was his nephew, but he stated instead that Palmer was his tenant and that Palmer owed him seven months back rent. Gibson explained that he gave Palmer approximately $24,000 in cash to hold while Gibson was out of town and that he was planning to pay taxes with the money.

The Commonwealth initiated forfeiture proceedings pursuant to Sections 6801–6802 of the Judicial Code (Forfeiture Act), 42 Pa.C.S. §§ 6801–6802. Although all three of the appellants were named as defendants in the forfeiture action, the statements of Myers and Palmer changed during discovery to more closely reflect Gibson's statement that the money was being held on his behalf by Palmer for safekeeping. Gibson refused to answer interrogatories or produce documents to verify his ownership of the funds; he also invoked his Fifth Amendment right against self-incrimination and even failed to appear at the forfeiture hearing. The trial court denied the Commonwealth's motion to compel Gibson to answer interrogatories and to produce requested documents, but the court did not preclude the possibility that it could draw a negative inference from Gibson's refusal to respond.

Approximately eight months before the July 16, 1998 forfeiture hearing, Myers and Palmer were again stopped speeding en route to New York from a central Pennsylvania origin. A consensual search of their vehicle revealed nine boxes of powdered scented laundry detergent and six containers of fabric softener. According to the corporal who made the stop and conducted the search, the discovery of the detergent suggested drug activity because such large quantities of scented detergent are used by drug traffickers to prevent narcotics canines from detecting controlled substances.

■■■ The trial court granted the Commonwealth's forfeiture petition. In doing so the court noted that the present case bears many similarities to *Commonwealth v. Marshall*, 548 Pa. 495, 698 A.2d 576 (1997), in which the Pennsylvania Supreme Court held that the evidence was insufficient to carry the Commonwealth's burden. However, the court distinguished *Marshall* by noting that Myers and Palmer were later stopped en route to New York carrying an abnormally large quantity of detergent, suggesting that these men were drug carriers and that the currency confiscated from their vehicle was connected to drug trafficking. The court further noted that Gibson refused to participate in discovery and claimed that to do so would incriminate him; that Myers and Palmer claimed at the hearing that Gibson was the true owner having received the currency as proceeds from a settlement of the estate of Gibson's deceased roommate; and that Gibson had failed to appear for the hearing or otherwise establish the origin of the money. Adding those additional facts to the totality of the circumstances and the lack of credibility in the testimony of Myers and Palmer convinced the court that the Commonwealth had established by a preponderance of the evidence a nexus between the seized currency and the sale or procurement of controlled substances.[1]

---

1. The Court's review of this matter is limited to determining whether the findings of fact made by the trial court are supported by competent evidence and whether the trial court abused its discretion or committed an error of law. *Marshall; see also Commonwealth v. Fontanez*, 679 A.2d 1361 (Pa. Cmwlth.1996), *appeal granted*, 547 Pa. 732, 689 A.2d 236 (1997). The trial court's findings of fact are entitled to the same deference

## II

Because this forfeiture proceeding involves currency, the Commonwealth bore the initial burden of proving either that the currency was "furnished or intended to be furnished ... in exchange for a controlled substance ... [or represents] proceeds traceable to such an exchange;" or that the currency was "used or intended to be used to facilitate any violation of The Controlled Substance, Drug, Device and Cosmetic Act." 42 Pa.C.S. § 6801(a)(6)(i); *Marshall.* Meeting this burden requires the Commonwealth to establish a nexus between the currency and the illegal activity by a preponderance of the evidence. *Marshall.* This standard requires only that the Commonwealth show that it is more likely than not that the nexus exists; the standard "is often alluded to as a weighing of the evidence and a determination based upon which way the scales are tipped." *Commonwealth v. Fidelity Bank Accounts,* 158 Pa. Cmwlth. 109, 631 A.2d 710, 718 (1993) (quoting *Commonwealth v. Doranzo,* 365 Pa.Super. 129, 133–134, 529 A.2d 6, 8 (1987)). Once the Commonwealth establishes such a nexus, the burden shifts to the claimant to establish ownership of the currency and its lawful acquisition and that it was not unlawfully used or possessed by the claimant. *Marshall.*

The Court will begin with Appellants' argument that the trial court erred in drawing a negative inference from Gibson's invocation of his right to silence. Appellants maintain that Gibson has a right to assert his Fifth Amendment privilege in this case without sanctions being imposed against him. Forfeiture proceedings are quasi-criminal in character but civil in form. *In re One 1988 Toyota Corolla,* 675 A.2d 1290 (Pa.Cmwlth.1996); *Commonwealth v. Landy,* 240 Pa.Super. 458, 362 A.2d 999 (1976). The United States Supreme Court has held that the Fifth Amendment's Self–Incrimination Clause applies to civil forfeitures when the forfeiture statute makes the owner's culpability relevant and when the owner faces subsequent criminal proceedings. *Austin v. United States,* 509 U.S. 602, 608 n. 4, 113 S.Ct. 2801, 2804 n. 4, 125 L.Ed.2d 488, 496 n. 4 (1993). However, the trial court here merely drew an adverse inference from Gibson's decision to invoke his right against self incrimination. In a criminal proceeding such an inference would be proscribed; however, it is well settled that forfeiture litigants are not afforded the full panoply of rights available to criminal defendants. *Landy.*

The Supreme Court recently provided the following explanation of the evidentiary value of a civil litigant's invocation of the right to silence:

In *Baxter v. Palmigiano,* 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976), the U.S. Supreme Court addressed the constitutional concern implicated by the evidentiary use of one's assertion of the Fifth Amendment privilege in a civil matter. The *Baxter* Court embraced the rule that 'the Fifth Amendment does not forbid adverse inferences against parties in civil actions when they refuse to testify in response to probative evidence offered against them[.]' *Id.* at 318, 96 S.Ct. at 1558, 47 L.Ed.2d at 821.

The inference discussed in *Baxter* is akin to the well established rule in civil proceedings that a party's failure to testify can support an inference that whatever testimony he would have given would have been unfavorable to him. *See Beers v. Muth,* 395 Pa. 624, 151 A.2d 465 (1959). Our case law indicates that the inference to be drawn from a party's failure to testify serves to corroborate the evidence produced by the opposing party. *See Dommes v. Zuroski,* 350 Pa. 206, 209, 38 A.2d 73, 75 (1944). Also,

---

as those of a jury, and it is axiomatic that as factfinder the trial court is empowered to decide what evidence is credible and to draw any reasonable inferences from all of the evi-

dence. *Commonwealth v. Fidelity Bank Accounts,* 158 Pa.Cmwlth. 109, 631 A.2d 710 (1993).

the failure to testify to facts within one's presumed knowledge permits an inference that can erase the equivocal nature of other evidence relating to a disputed fact. *See Hall v. Vanderpool,* 156 Pa. 152, 26 A. 1069 (1893). However, we have never suggested that a party could satisfy its burden of proof in a civil cause solely through reliance on the defendant's failure to testify.

*Harmon v. Mifflin County School Dist.,* 552 Pa. 92, 98–99, 713 A.2d 620, 623—624 (1998) (footnote omitted).

▇▇▇ Thus the invocation of the right to silence by a litigant in a forfeiture proceeding can be used to draw an adverse inference that corroborates evidence produced by the opposing party, and if the litigant failed to testify to facts within the litigant's presumed knowledge then the invocation can erase the equivocal nature of other evidence relating to a disputed fact. Among other matters, Gibson refused to confirm a prior account that he had given of inheriting the currency, describe documentation associated with the currency, answer whether he had ever used or distributed controlled substances or answer whether he had acquired the currency through the sale of controlled substances. All of these matters can be presumed to be within Gibson's knowledge. Accordingly, the trial court was permitted to draw an adverse inference from Gibson's refusal to answer that erased the equivocal nature of the other evidence produced by the Commonwealth tending to establish a nexus between the currency and illegal drug activity. As previously discussed, however, the trial court did not rely solely upon the negative inference to conclude that the Commonwealth had satisfied its burden of proof.

▇▇▇ Appellants principally rely on *Marshall* in support of their argument that the evidence is insufficient to meet the Commonwealth's burden. In *Marshall* a state police trooper made a routine traffic stop of a vehicle containing three people and discovered outstanding warrants for the driver and the front-seat passenger. The trooper requested that the appellant, who was sitting in the rear of the vehicle, step outside. As he did so the trooper noticed a large sum of currency partially exposed under the back seat cushion. A search of the vehicle revealed $3,400, packaged in $100 bundles; no drugs or drug paraphernalia were found but a dog sniff of the currency indicated the residual presence of a controlled substance. The driver and the appellant gave inconsistent statements. At the hearing the appellant testified that the currency had been advanced to him by a friend to buy food for catering work. The trial court found this testimony not credible and granted forfeiture.

On appeal the Supreme Court held in *Marshall* that the trial court had erred in concluding that the Commonwealth met its burden of proof. The court reasoned that "[a] completely innocent citizen of this Commonwealth could have in his or her possession, at any time, currency that happened to be involved in a drug transaction at some unknown time in the past" and that the Commonwealth's evidence established "only the possibility or suspicion of a nexus." *Marshall,* 548 Pa. at 500, 698 A.2d at 579. However, the court's reasoning is not equally applicable here. In *Marshall* there was no refusal to respond to discovery nor was there a refusal to testify, giving rise to a negative inference; moreover, there was no subsequent event involving the appellant and the driver suggesting drug trafficking.

While Appellants here could have come innocently into the possession of currency previously connected to drug activity, and Myers and Palmer could have been innocently transporting detergent to do their laundry, in light of Gibson's refusal to respond to discovery, to appear to testify at the forfeiture hearing or to otherwise establish the origin of the seized currency, the trial court was well within its authority when it determined that the Commonwealth had met its burden by a preponderance of the evidence. The trial court's

findings were amply supported by substantial evidence, and Appellants offered no credible evidence to sustain their burden to establish Gibson's ownership of the currency and its lawful acquisition and that it was not unlawfully used or possessed.

## III

Lastly, Appellants contend that the United States Supreme Court's decision in *United States v. Bajakajian,* 524 U.S. 321, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998), prevents forfeiture in this case. In that case the Supreme Court announced the "grossly disproportional" test. Bajakajian and his wife attempted to leave the United States without reporting $357,144 on their persons and in their luggage. Federal law requires the reporting of currency in one's possession in excess of $10,000 when one leaves the country and provides for forfeiture of the currency when the law is violated. The court concluded that the forfeiture of the currency under the statute at issue constituted punishment to which the Excessive Fines Clause of the Eighth Amendment applied, and it held that full forfeiture of Bajakajian's currency would be grossly disproportional to the gravity of his offense in violation of that clause. The court explained that when a forfeiture is punitive, the test for excessiveness turns solely on the principle of proportionality: "The amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish." *Id.* at ——, 118 S.Ct. at 2036.

 As with the statute at issue in *Bajakajian,* constitutional protections against excessive fines apply to the Forfeiture Act. *In re King Properties,* 535 Pa. 321, 635 A.2d 128 (1993). However, Appellants have wholly failed to explain how forfeiture of the currency at issue is grossly disproportional to the gravity of the offense that the Forfeiture Act was designed to punish. In *Bajakajian* the crime was solely a reporting offense, and the money represented the proceeds of legal activity to be used to repay a lawful debt. To the contrary, in this case, the evidence supports the trial court's determination that the currency either represented the proceeds of a drug violation or was intended to be used as such. Under these circumstances the Court cannot sanction Appellants' position that the forfeiture of the currency was disproportionate to the gravity of the offense committed. The order of the trial court is affirmed.

Judge FRIEDMAN dissents.

## *ORDER*

AND NOW, this 2nd day of July, 1999, the order of the Court of Common Pleas of Cumberland County is affirmed.